**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR A
CRIMINAL COMPLAINT AND SEARCH WARRANT**

I, Garrett S. Hassett, being sworn, state:

## Introduction and Agent Background

1.     I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since September 2018, and am currently assigned to the Boston Field Office, Organized Crime Drug Enforcement Task Force ("OCDETF") Strike Force.  I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

2.     Prior to my current employment with the FBI, I was employed by the Rhode Island State Police for approximately seven years.  During that time, I worked in the uniform division and as a member of the Domestic Highway Enforcement team.

3.     During my career in law enforcement, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug trafficking conspiracies.  In the course of conducting criminal investigations, I have employed the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term narcotics investigations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and toll record data, conducting court-authorized electronic surveillance; and preparing and executing search warrants that resulted in substantial seizures of narcotics, firearms, and other contraband.

4.     Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal

activity.    I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers.

5.    Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.  I am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, and other means to facilitate their illegal activities.

**Purpose of the Affidavit**

6.    I submit this affidavit in support of an application for a criminal complaint charging Jeffry CARMONA, a/k/a "El Gordo," FNU LNU, a/k/a "NATACHA,"  Miguel POLANCO, and ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (collectively, the "Target Subjects") with Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of Fentanyl, 100 Grams or More of Fentanyl Analogue, and 500 Grams or More of Methamphetamine, in violation of Title 21, United States Code, Section 846 (hereinafter, the "Charged Offense").

7.    I also make this affidavit in support of an application for a warrant authorizing the search of 88 Burt Street, Apartment #3, Dorchester, Massachusetts, believed to be CARMONA's residence (the "Target Premises"), further described in Attachment A, for evidence of the Charged Offense, described more fully in Attachment B.

8.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show that there is probable cause to believe that the Target Subjects committed the Charged Offense.  Additionally, there is probable cause to believe that evidence of the Charged Offense,

described more fully in Attachment B, exists in the Target Premises, described more fully in Attachment A.  This affidavit is intended to show that there is probable cause for the requested criminal complaint and search warrant and does not set forth all of my knowledge about this matter.

**Probable Cause**

*Investigation Background*

9.   From January 2020, through May 2020, investigators gathered evidence on the target subjects of a federal drug and money laundering investigation through consensually recorded telephone calls and preserved text messages, telephone calls and text messages intercepted pursuant to court orders authorizing the interception of wire and electronic communications, surveilled meetings between the targets, confidential sources for the government, and other individuals involved in laundering drug proceeds, subpoenas to financial entities, and other investigative techniques.  Investigators learned that the target subjects were involved in laundering drug proceeds through financial entities and through the purchase of the cryptocurrency, specifically Bitcoin.

10. Through that investigation, investigators developed a cooperating witness (hereinafter, "CW-1"), who developed and provided information about the laundering of drug proceeds through financial entities and Bitcoin purchases.  CW-1 is willing to testify if needed.[1]
After conducting several operations with CW-1, during which investigators identified several targets involved in suspected money laundering activities, investigators were able to successfully

---

[1] CW-1 has no criminal history.  CW-1 originally agreed to cooperate with investigators in the hope that future criminal charges or penalties relating to CW-1's money-laundering activities could be avoided or reduced. CW-1 has provided information that has been corroborated and that has led to the identification of additional targets of this investigation and seizures of drug proceeds.  Information provided by CW-1 is believed to be reliable.

introduce law enforcement agents acting in undercover capacities as associates of CW-1 to these targets. These undercover agents were introduced as being capable of accepting bulk cash and converting it into Bitcoin. Since these initial introductions, undercover agents have picked up bulk cash believed to be drug proceeds from various money launderers and drug traffickers in multiple locations around the United States and transmitted Bitcoin to wallets identified by the traffickers.

*Introduction of CO-CONSPIRATOR 1 from Mexico*

11. On April 27, 2021, after coordinating with a suspected money launderer, an agent acting in an undercover capacity ("UC-1"), conducted a pickup in Boston of $100,000 of suspected drug proceeds to be laundered through a Bitcoin transfer. The money courier traveled from New York to Boston with the bulk cash. UC-1 collected the cash from the courier, and another agent acting in an undercover capacity ("UC-2") transmitted $100,000 of Bitcoin to a wallet identified by the suspected money launderer. Shortly after this April 27, 2021 transaction, UC-1 received a text message from a Mexican phone number, 52-667-207-5815. The user of that phone number identified himself as being from Culiacan, Mexico (hereinafter, "CO-CONSPIRATOR 1"). CO-CONSPIRATOR 1 stated that he had received many of the Bitcoin transfers that UC-1 had conducted in the Boston area. Since that first April 27, 2021 introduction, CO-CONSPIRATOR 1 and UC-1 have continued to communicate and have arranged multiple bulk cash drop-offs in exchange for Bitcoin in locations throughout the U.S. These text messages between UC-1 and CO-CONSPIRATOR 1 have all been preserved.

*CO-CONSPIRATOR 1 Introduced UC-1 to CARMONA and NATACHA for the Purpose of Arranging a One Kilogram Purchase of Fentanyl and Acetylfentanyl on May 14, 2021.*

12. Between May 13 and 14, 2021, UC-1 exchanged multiple text messages via Telegram, a secure messaging application, with CO-CONSPIRATOR 1. These messages have

been preserved.  CO-CONSPIRATOR 1 offered to sell UC-1 one kilogram of fentanyl, which CO-CONSPIRATOR 1 referred to as "juguetes," meaning toys, and "fenta," meaning fentanyl.  CO-CONSPIRATOR 1 stated that he had "Dominican friends" who were currently in Boston.  CO-CONSPIRATOR 1 referred to these Dominican friends as "Los Reyes de los juguetes," meaning the kings of the toys.  CO-CONSPIRATOR 1 told UC-1 that he would have these friends deliver one kilogram of fentanyl to UC-1, so that UC-1 could provide the fentanyl to his "boss" to check the quality of the drugs.  CO-CONSPIRATOR 1 told UC-1 that once UC-1's boss checked the quality, CO-CONSPIRATOR 1 and UC-1 could discuss prices and quantities of future drug purchases.  CO-CONSPIRATOR 1 explained that he had two types of fentanyl, one which was "300," and one which was "250."  Based on my experience and training, I understood "300" and "250" to refer to the relative qualities, or purities of the fentanyl, with "300" being the higher quality of the two types.  CO-CONSPIRATOR 1 stated that the kilogram he would have delivered to UC-1 would be "300."  CO-CONSPIRATOR 1 explained that he made the fentanyl "there," meaning in Mexico, and sent it to Boston.  CO-CONSPIRATOR 1 stated that the fentanyl was in high demand and would be gone quickly.

13.  CO-CONSPIRATOR 1 requested UC-1 provide a different telephone number that CO-CONSPIRATOR 1 would pass to the courier who would deliver the kilogram of fentanyl.  On May 13, 2021, UC-1 provided a new phone number to CO-CONSPIRATOR 1.  On May 14, 2021, UC-1 received a telephone call from (617) 516-3123 (the "3123 Phone").  The caller referred to himself as "El Gordo."  Investigators later identified "El Gordo" as CARMONA.[2]  UC-1 and

---

[2] Investigators obtained an arrest record for CARMONA from Immigration and Customs Enforcement ("ICE") for an arrest at a border crossing.  The record contained a photo of CARMONA.  UC-1 viewed the photo and identified CARMONA as the man UC-1 had met on multiple occasions to purchase drugs, described in detail below.  During a

CARMONA discussed potential locations to meet to exchange the kilogram of fentanyl. CARMONA stated that he was in Dorchester and agreed to meet UC-1 in Boston. CARMONA requested that UC-1 use WhatsApp to communicate with him. CARMONA stated that he would send "his sister" to drop off the drugs. This call was not recorded.

14. A short time later, UC-1 received a telephone call from (646) 651-5534. The user of (646) 651-5534 referred to herself as NATACHA.[3] NATACHA and UC-1 discussed the timing and method for the delivery. NATACHA stated that she had placed the kilogram in a "nice perfume box." They agreed to meet the following day. This call was recorded.

15. On May 14, 2021, at approximately 3:15 p.m., UC-1 arrived at the meeting location in Boston in his/her vehicle. Other investigators were also present to surveil the meeting. The meeting was audio / video recorded. While waiting for NATACHA to arrive with the drugs, UC-1 had multiple phone calls with CARMONA, on the 3123 Phone, and NATACHA, on (646) 651-5534. NATACHA was late for the delivery. UC-1 also sent text messages to CO-CONSPIRATOR 1 regarding the delivery. These phone calls were not recorded, but the text messages were preserved.

16. In one phone call with CARMONA, CARMONA stated that he would send someone to pick up NATACHA to take her to the meeting location. UC-1 then had another phone call with NATACHA. UC-1 asked for NATACHA's expected time of arrival. UC-1 could

---

meeting with UC-1 and other undercover agents on December 12, 2021, CARMONA stated that his birthday was in March. CARMONA's date of birth is March 24, 1991. Based on this information, investigators believe that "El Gordo" is CARMONA. I will refer to him as CARMONA for the remainder of this affidavit.

[3] Although investigators know who NATACHA is in the sense that they know what she looks like, they do not at this time know her true name.

overhear NATACHA ask someone in the background that appeared to be her driver when they would arrive.  These phone calls were not recorded.

17.   A short time later, a red Toyota Camry, bearing Massachusetts Livery plates 58585, arrived at the meeting location.  NATACHA exited the vehicle and greeted UC-1 outside of UC-1's vehicle.  NATACHA handed UC-1 a perfume box, which she referred to as the "gift," which contained the kilogram of fentanyl.  NATACHA apologized for the delay and explained that it would not happen again.  NATACHA then returned to the Camry and departed the area.

18.   UC-1 then departed the meeting location and met with other investigators at a predetermined location.  Investigators collected the kilogram of fentanyl from UC-1.  The fentanyl was stamped and wrapped with a Batman logo.  The drugs were sent to the Drug Enforcement Administration ("DEA") Laboratory for testing, tested positive for fentanyl and acetylfentanyl, and weighed 989 grams.

19.   On June 3, 2021, UC-2 transmitted $35,000 in Bitcoin to a Bitcoin wallet provided by CO-CONSPIRATOR 1 as payment for the one kilogram of drugs purchased on May 14, 2021.

*On June 11, 2021, CO-CONSPIRATOR 1 and POLANCO*
*Sold One Kilogram of Fentanyl and Acetylfentanyl to UC-1.*

20.   In the days leading up to June 11, 2021, UC-1 and CO-CONSPIRATOR 1 exchanged phone calls and text messages regarding the sale of one kilogram of fentanyl in Massachusetts.  CO-CONSPIRATOR 1 agreed to facilitate the sale of the kilogram of fentanyl for $35,000 to be paid in Bitcoin after the deal took place.  CO-CONSPIRATOR 1 provided a telephone number for his drug courier, later identified as POLANCO.[4]  On June 11, 2021, UC-1

---

[4] POLANCO was identified by investigators after the drug transaction described below.

communicated directly with POLANCO to confirm the meeting time and location, a restaurant in Boston. All communications were recorded and preserved.

21. Prior to the meeting, investigators equipped UC-1 with an audio / video recording device. UC-1 and two other agents acting in undercover capacities then traveled to the restaurant. A short time later, POLANCO arrived at the meeting location holding a red gift bag. POLANCO greeted the undercover agents and handed him the red gift bag. There was very little discussion among POLANCO and the undercover agents. POLANCO exited the restaurant and departed the area.

22. UC-1 and the other undercover agents departed the area and met with investigators at a predetermined location. UC-1 turned over the fentanyl to investigators. The drugs were sent to the DEA Laboratory for testing, tested positive for fentanyl and acetylfentanyl, and weighed 970 grams. The drug packaging was sent to the FBI Laboratory for fingerprint analysis. There were latent prints on the packaging suitable for comparison. Some of the latent prints were a positive match for POLANCO, as identified through the Next Generation Identification system. Due to a previous arrest, the prints were linked to POLANCO's file in a law enforcement database. POLANCO's file had a photograph in it. UC-1 confirmed that the man he/she met on June 11, 2021 to conduct the drug deal was the same man in the photograph in POLANCO' file.[5]

23. On June 16, 2021, UC-2 transmitted $35,000 in Bitcoin to a Bitcoin wallet provided by CO-CONSPIRATOR 1 as payment for the one kilogram of fentanyl and acetylfentanyl purchased on June 11, 2021.

---

[5] There were latent prints of other individuals found on the packaging in addition to POLANCO's.





*On July 20, 2021, CO-CONSPIRATOR 1 and CARMONA*
*Sold UC-1 Five Kilograms of Methamphetamine.*

30. In the days leading up to July 20, 2021, UC-1 and CO-CONSPIRATOR 1 exchanged phone calls and text messages regarding the sale of five kilograms of methamphetamine in Massachusetts.  CO-CONSPIRATOR 1 agreed to facilitate the sale of the methamphetamine for $34,000 to be paid in Bitcoin after the deal took place.  Additionally, UC-1 was expected to

pay $1,000 to the courier who arrived with the methamphetamine.  These communications were preserved.

31.  Prior to the July 20, 2021 meeting, UC-1 and CARMONA exchanged communications over the 3123 Phone.  In those exchanges, CARMONA confirmed the meeting date, time, and location, a restaurant in Boston.  All text messages and calls have been preserved.

32.  On July 20, 2021, UC-1 arrived at the meeting location.  Other investigators were also present to surveil the meeting.  The meeting was audio / video recorded.  CARMONA arrived at the meeting in a taxi and met with UC-1 in the restaurant.  CARMONA provided UC-1 with a package containing the methamphetamine.  UC-1 handed CARMONA the $1,000.  CARMONA then departed the meeting location.  At the conclusion of the meeting, UC-1 provided CARMONA with a new covert undercover telephone number.  Several hours later, CARMONA contacted UC-1 from a different phone number, (857) 350-0101 (the "0101 Phone"), and advised UC-1 that this new phone number was CARMONA's personal cell phone.

33.  UC-1 transported the methamphetamine back to a predetermined location to meet with other investigators.  The drugs were sent to the DEA Laboratory for testing, tested positive for methamphetamine, and weighed 4,910 grams, nearly all of it pure methamphetamine (4,886 grams).

34.  On September 21, 2021, UC-2 transmitted $34,000 in Bitcoin to a Bitcoin wallet provided by CO-CONSPIRATOR 1 as payment for the five kilograms of methamphetamine purchased on July 20, 2021.

*On November 7, 2021, CARMONA Sold UC-1 Three Kilograms of Fentanyl.*

35.  On October 13, 2021, UC-1 called CARMONA on the 0101 Phone.  This phone call was recorded and preserved.  UC-1 asked CARMONA to meet for lunch on Friday, October

15, 2021.  CARMONA asked UC-1 what the meeting discussion would entail.  UC-1 asked

CARMONA if they were speaking on his "work" or "personal" number.  Through my training and

experience, I know that it is common practice for those engaging in drug trafficking to possess

several telephones to keep their personal and illegal activities separate, and that drug traffickers

often carry multiple phones on their persons at all times.  CARMONA told UC-1 not to call 0101

Phone in the future and asked UC-1 to send him a new number that CARMONA could call.  UC-

1 provided CARMONA with a new covert telephone number.

36.  On October 13, 2021, a short time after UC-1 and CARMONA's initial phone call

on the 0101 Phone, UC-1 received a telephone call from CARMONA on (857) 308-8175 (the

"8175 Phone").  This phone call was recorded and preserved.  In lightly coded language,

CARMONA advised UC-1 that CARMONA would not personally meet with UC-1 to deliver the

drugs, but that CARMONA's associates would actually deliver the drugs.  Through my training

and experience, I understood this exchange to mean that CARMONA would send a courier to meet

UC-1 with narcotics.  UC-1 and CARMONA spoke about CO-CONSPIRATOR 1 from Mexico

and how CO-CONSPIRATOR 1 had not been available lately.  UC-1 asked CARMONA if he had

any "product" for UC-1 to purchase.  Based on experience and training, I understood this exchange

to mean that CO-CONSPIRATOR 1 was not available to ship drugs to UC-1 and that UC-1 asked

CARMONA if he had any drugs available for sale to UC-1.  CARMONA confirmed he had "good

quality" product and inquired about the quantity UC-1 needed.  UC-1 told CARMONA "two to

three."  CARMONA advised UC-1 that he could facilitate the sale of "two to three" to UC-1, and

that CARMONA would sell each kilogram to UC-1 for $40,000 each.  Based on experience and

training, I understood this exchange to mean that CARMONA would sell UC-1 two to three kilograms of fentanyl for $40,000 per kilogram.

37.  UC-1 and CARMONA then discussed how to ensure this transaction between UC-1 and CARMONA would not cause any issues with their mutual "friend."  Based on experience and training, I understood this exchange to mean that CARMONA was concerned with harming his relationship with CO-CONSPIRATOR 1, his usual drug supplier, if CARMONA sold drugs to UC-1 from a different supplier.  CARMONA advised UC-1 that he had a source of supply different from CO-CONSPIRATOR 1 and that the quality of fentanyl was just as good as the fentanyl CARMONA had previously received from CO-CONSPIRATOR 1.

38.  UC-1 asked CARMONA if he understood which product UC-1 was looking for, and UC-1 explained that UC-1 was not looking for the last product CARMONA delivered [methamphetamine on July 20, 2021] but was looking for the product CARMONA's sister [NATACHA] previously delivered to UC-1 [fentanyl on May 14, 2021].  CARMONA confirmed the product he was referring to was the product his sister [NATACHA] had delivered [fentanyl].

39.  On October 14, 2021, UC-1 unsuccessfully tried to reach CARMONA on the 8175 Phone, and the call went unanswered.  UC-1 then called CARMONA on the 0101 Phone via WhatsApp and told CARMONA that UC-1 had tried to contact him on the 8175 Phone but was not successful.  CARMONA advised UC-1 that he was at his "woman's house" and left the 8175 Phone at home.  UC-1 and CARMONA discussed the timing for the October 15, 2021 meeting to complete the fentanyl delivery.  CARMONA stated he would call "his guy" to see if he was available to meet UC-1 on October 15, 2021.  This WhatsApp phone call was recorded and

preserved.  Based on experience and training, I believe CARMONA stated that he would check to see if his courier was available to deliver the drugs on October 15, 2021.

40.  CARMONA then asked UC-1 if UC-1 had reached out to "El Patron," because CARMONA contacted "El Patron" and he responded.  UC-1 advised CARMONA that UC-1 had not heard back from "El Patron."  CARMONA then told UC-1 that CARMONA was going to call "El Patron" and have "El Patron" call UC-1 because CARMONA did not want to disrupt the friendship between CARMONA and "El Patron."  Based on the context of this reference in the discussion and CARMONA's other references to CO-CONSPIRATOR 1 during the same communication, investigators believe that "El Patron" is another name for CO-CONSPIRATOR 1.  Investigators also understood this exchange to mean that CARMONA was still concerned that selling UC-1 fentanyl from another supplier would harm his relationship with CO-CONSPIRATOR 1.

41.  Between October 15 and November 7, 2021, UC-1 continued to have discussions with CO-CONSPIRATOR 1 and CARMONA about the potential delivery of three kilograms of fentanyl.  UC-1 and CARMONA agreed to meet at a restaurant in Boston on November 7, 2021.  UC-1 and CO-CONSPIRATOR 1 agreed that UC-1 would provide $3,000 to CARMONA at the meeting and pay the remainder in Bitcoin to CO-CONSPIRATOR 1 after the meeting took place.

42.  On November 7, 2021, UC-1 was equipped with an audio / video recording device.  UC-1 then drove to the planned meeting location.  Investigators also placed surveillance around the meeting location and around CARMONA's residence, the Target Premises.  At approximately 11:57 a.m., investigators observed CARMONA depart from the entrance to the building where the Target Premises is located and walk down the street.  Investigators surveilled CARMONA as he boarded a bus, rode several stops, and exited the bus.  Investigators observed CARMONA enter

14

the front door of 570 Blue Hill Avenue, Boston, Massachusetts, empty handed. Approximately ten minutes later, CARMONA exited 570 Blue Hill Avenue with a bag in his hand and entered the backseat of a vehicle. Due to evasive driving, investigators lost surveillance of the vehicle for approximately ten minutes.

43. At approximately 1:13 p.m., investigators observed CARMONA arrive at the restaurant to meet with UC-1. CARMONA arrived with a gift bag in his hand and told UC-1 that he was told to "bring three," meaning three kilograms of fentanyl. CARMONA and UC-1 discussed CO-CONSPIRATOR 1. UC-1 explained that UC-1 was concerned CO-CONSPIRATOR 1 was angry with UC-1 for trying to cut CO-CONSPIRATOR 1 out of their drug-dealing arrangement. CARMONA explained that CO-CONSPIRATOR 1 was CARMONA's true friend and that CARMONA would do anything and go anywhere for CO-CONSPIRATOR 1. In lightly coded language, CARMONA stated that he had gone down to New York to pick up drugs for CO-CONSPIRATOR 1 in the past.

44. CARMONA and UC-1 discussed future drug business. CARMONA asked UC-1 if UC-1's boss was interested in other drugs in addition to methamphetamine and fentanyl. CARMONA explained that he could also supply cocaine. CARMONA handed UC-1 the gift bag containing the three kilograms of fentanyl. UC-1 provided CARMONA with $3,000 as a previously agreed-upon partial payment for the fentanyl.

45. Prior to the meeting between UC-1 and CARMONA, investigators met with a cooperating witness who was in a position to testify ("CW-2") at a predetermined location and

searched him/her for contraband and currency with negative results.[7]   During the meeting, after UC-1 and CARMONA were already seated at their table in the restaurant, CW-2 entered the restaurant and retrieved the bag containing the fentanyl.  UC-1 told CARMONA that CW-2 was UC-1's associate and would transport the drugs away from the meeting.  CW-2 then left the meeting location and met with investigators at a nearby predetermined location.  At the predetermined location, CW-2 turned the fentanyl over to investigators.  Investigators maintained surveillance of CW-2 the entire time he had possession of the bag containing the fentanyl.  After CW-2 turned over the fentanyl to investigators, investigators searched CW-2 for contraband and currency with negative results.

46.   At one point during the meeting, CARMONA received a phone call from a Mexican telephone number 52-16621063612.  During that phone call, CARMONA inquired whether the partial payment from UC-1 was in fact $3,000, and UC-1 confirmed it was.  Thereafter, CARMONA and UC-1 discussed possible future deals for cocaine.  CARMONA stated that he would charge between $28,000 and $30,000 for one kilogram of cocaine depending on the quantity

---

[7] CW-2 is a documented source of information who has cooperated with the DEA, the FBI, and the Quincy, Massachusetts Police Department in the past.  CW-2 has a criminal record that includes multiple arrests for drug distribution offenses and for threatening, and at least one arrest for possessing a controlled substance in a school zone or park.  CW-2's criminal record also includes convictions for possessing a Class A substance with intent to distribute it (two convictions, at least one of which was for heroin), for possessing a Class D controlled substance (marijuana) with intent to distribute it, and for conspiracy to violate the Controlled Substances Laws.  Information provided by CW-2 has led to seizures of narcotics and identification of drug traffickers.  Information provided by CW-2 is believed to be reliable.

UC-1 purchased.  CARMONA stated that he was CO-CONSPIRATOR 1's right hand man.  The discussion continued until eventually both CARMONA and UC-1 departed from the meeting.

47.  The drugs UC-1 received from CARMONA were sent to the DEA Laboratory for testing, tested positive for fentanyl, and weighed 2,999 grams.

48.  On November 15, 2021, UC-1 had a recorded phone call with CO-CONSPIRATOR 1.  UC-1 inquired about purchasing more methamphetamine.  CO-CONSPIRATOR 1 stated that UC-1 could pick up methamphetamine in Nashville or New York.  CO-CONSPIRATOR 1 also offered to have CARMONA pick up the methamphetamine in New York and transport it to Boston for UC-1.  CO-CONSPIRATOR 1 also inquired about the quality of the fentanyl UC-1 purchased on November 7, 2021 from CO-CONSPIRATOR 1 and CARMONA.  CO-CONSPIRATOR 1 stated that the fentanyl from November 7, 2021 should have been of higher quality than the fentanyl from previous drug sales.

49.  In three separate transfers on December 24, 2021, December 28, 2021, and January 4, 2022, UC-2 transmitted $70,000 in Bitcoin to a Bitcoin wallet provided by CO-CONSPIRATOR 1 as payment for the three kilograms of fentanyl purchased on November 7, 2021.

*On December 22, 2021, CARMONA Sold CW-2 247 Grams of Fentanyl*
*After Leaving from the Target Premises.*

50.  In the days leading up to December 12, 2021, UC-1 and CARMONA agreed to meet at the Encore Casino for a night out and to discuss future drug sales.  On December 12, 2021, CARMONA sent UC-1 a photograph of himself to show UC-1 what he was wearing that night.  In the photograph, the background shows a gray-colored wall, a white door, and light-colored hardwood floors.  Investigators reviewed photographs of the interior of the Target Premises which they found on a publicly available real estate website and compared them to the background shown

17

in the photograph CARMONA sent.  Investigators observed the same color walls, door, and hardwood floors in those real estate photographs.  Based on this comparison, investigators believe that CARMONA took the photograph from inside the Target Premises.  Based on experience and training, and the fact that CARMONA was getting ready for his meeting with UC-1 inside the Target Premises, investigators believe that the Target Premises is CARMONA's residence.  Prior to the meeting, UC-1 was equipped with an audio / video recording device.

51. On the evening of December 12, 2021, another cooperating witness for the government ("CW-3")[8] picked up CARMONA and one other man CARMONA identified as his "cousin" within one block of the Target Premises.  A few minutes prior to picking up CARMONA, pole camera footage showed a male believed to be CARMONA exit the entrance to the building where the Target Premises is located.  Due to the lack of daylight, investigators could not positively identify the male as CARMONA, although given the time proximity to the pickup, investigators believe CARMONA had departed from the Target Premises. CW-3 drove CARMONA and the other man to pick up one other unidentified male, who CARMONA also identified as his "cousin." CW-3 drove CARMONA and the two other men to the Encore Casino to meet UC-1 and other undercover agents. At the Encore Casino, during this meeting, in lightly coded language, CARMONA described his ability to sell UC-1 both cocaine and fentanyl.  CARMONA explained that he had access to another Mexican drug supplier, in addition to CO-CONSPIRATOR 1, who

---

[8] CW-3 was previously arrested for distribution of controlled substances in Massachusetts. That case was dismissed. CW-3 began working with the FBI in the hope that his state charge would be dismissed or that he would receive a lesser sentence for it, and for monetary compensation. Information provided by CW-3 has led to identifications of narcotics traffickers, arrests, and seizures of narcotics. Information provided by CW-3 is believed to be reliable.

could provide CARMONA with cocaine and fentanyl.  CARMONA stated the prices for cocaine ($30,000 per kilogram) and fentanyl ($40,000 per kilogram).

52.  UC-1 and CARMONA discussed transportation of drugs.  CARMONA stated that he never drove drugs in a vehicle, and that he preferred to take public transportation.  CARMONA agreed to supply UC-1 with a sample of the fentanyl from CARMONA's other supplier.

53.  In the days leading up to December 22, 2021, UC-1 and CARMONA exchanged phone calls and text messages to set up a drug purchase.  These calls and text messages were recorded and preserved.  CARMONA agreed to sell UC-1 200 grams of fentanyl and 50 grams of cutting agent (used to dilute the drugs for resale) for $7,000.  UC-1 stated that his/her associate would pick up the drugs, referring to CW-3.  UC-1 and CARMONA agreed that the deal would take place in the vicinity of 580 Blue Hill Avenue, Dorchester, Massachusetts.

54.  On December 22, 2021, UC-1 conducted a Facetime call with CARMONA.  The purpose of the call was for CARMONA to show UC-1 how CARMONA cut and mixed his drugs.  Prior to the Facetime call, however, CARMONA had already mixed the drugs, so CARMONA did not show UC-1 this process during the Facetime call.  However, during the call, UC-1 was able to see the interior of CARMONA's apartment.  CARMONA walked in and out of the apartment to a back porch.  When he did so, UC-1 observed that CARMONA was on the top floor of his building, since there were no steps going higher than CARMONA's floor.  Additionally, CARMONA looked out the front window of his apartment with his phone, which showed a convenience store on the street below with a distinct red awning and red trim with a painting on the outside wall.  Based on physical surveillance, investigators know that outside of the Target Premises, on the corner, is Los Caballeros Market at 796 Washington Street.  This convenience store has the same physical features that UC-1 could observe from the Facetime call.  At the end of the Facetime call,

19

CARMONA showed UC-1 a drug package inside his apartment.  The drug package was wrapped in green cellophane and appeared to be a smaller block of powder chipped off of a pressed kilogram of powder.   A short time later, CARMONA delivered this same drug package to CW-3, as described below.  Based on experience and training, investigators believe that CARMONA was storing drugs at the Target Premises on December 22, 2021.

55.   On December 22, 2021, investigators met with CW-3 at a predetermined location. Investigators searched CW-3's person and vehicle for contraband and currency with negative results.   Investigators equipped CW-3 with an audio / video recording device and provided him with $3,000 for the purchase.

56.   At approximately 3:30 p.m., pole camera footage showed that CARMONA exited the entrance to the building where the Target Premises is located.

57.   Investigators surveilled CW-3 as he drove to the meeting location.  CW-3 parked his vehicle on the street in the vicinity of 580 Blue Hill Avenue.  CARMONA and an unidentified male approached CW-3's vehicle.   CARMONA entered CW-3's vehicle in the front passenger side.   The unidentified male waited outside CW-3's vehicle.   CW-3 showed CARMONA the $3,000 in a coffee cup in the cup holder of CW-3's vehicle, and asked CARMONA if he had anything for CW-3.  CARMONA removed two packages containing a powder substance from his coat pocket.  CARMONA asked CW-3 if he would be conducting the drug pickups in the future. CW-3 said that he would.   CARMONA and the unidentified male then left CW-3 and walked away.  Investigators surveilled CARMONA and the unidentified male walking away from the area down Blue Hill Avenue.

58.   Investigators surveilled CW-3 as he drove back to the predetermined location.  At the predetermined location, CW-3 turned over a drug package wrapped in green cellophane which

appeared to be a smaller block of powder chipped off of a pressed kilogram of powder. Investigators who had seen the drug package during the Facetime call with CARMONA described above, believe it to be the same package CARMONA delivered to CW-3 and CW-3 turned over to investigators.   CW-3 also provided investigators a smaller bag of loose powder, which CARMONA stated was the cutting material.   CARMONA had not shown this bag of powder during the Facetime call.   Investigators searched CW-3 for contraband and currency with negative results.   The drugs CW-3 received from CARMONA were sent to the DEA Laboratory, tested positive for the presence of fentanyl, and weighed 247 grams.   The powder in the smaller bag that investigators believed would be cutting material still contained a detectable amount of fentanyl.

59.   In the days leading up to December 29, 2021, in recorded phone calls and text messages, UC-1 and CARMONA agreed that CW-3 would meet with CARMONA to pay him the remaining $4,000 owed for the fentanyl purchased on December 22, 2021.

60.   On December 29, 2021, investigators met CW-3 at a predetermined location. Investigators searched CW-3 and his vehicle for contraband and currency with negative results. Investigators equipped CW-3 with an audio / video recording device and provided him with $4,000 to pay CARMONA.   Investigators surveilled CW-3 as he drove to the meeting location in the vicinity of 580 Blue Hill Avenue.

61.   At the meeting location, CW-3 parked on the street.   An unidentified male[9] approached CW-3's vehicle and entered on the front passenger side of the vehicle.   The unidentified male was using his phone and had CARMONA on speaker phone.   CW-3 and

---

[9] This unidentified male was different from the unidentified male from the December 22, 2021 drug sale. Neither male was ever identified.

CARMONA spoke over the unidentified male's phone and CW-3 identified the speaker as CARMONA.  The unidentified male told CARMONA over the speaker phone that he was with CW-3.  CW-3 confirmed to CARMONA, over the phone, that CW-3 was providing the unidentified male with $4,000.  CARMONA stated that he needed to provide CW-3 with "a sample," and CW-3 stated that he would coordinate with UC-1.  Based on my experience and training, I understood "sample" to mean a small amount of additional drugs for the purpose of determining whether CW-3 wanted to buy a larger quantity.  The unidentified male then exited CW-3's vehicle and departed the area.

62.   Investigators surveilled CW-3 as he drove back to the predetermined location.  At the predetermined location, investigators searched CW-3 for contraband and currency with negative results.

*On February 16, 2022, CARMONA Provided a Sample of Suspected Fentanyl Pills to CW-3, then Returned to the Target Premises.*

63.   In the days leading up to February 16, 2022, UC-1 and CARMONA exchanged phone calls and text messages to set up a meeting for CW-3 to pick up a sample of fentanyl pills. These calls and text messages were recorded and preserved.  UC-1 stated that his/her associate would pick up the sample, referring to CW-3.  UC-1 and CARMONA agreed that the deal would take place in the vicinity of 580 Blue Hill Avenue, Dorchester, Massachusetts.

64.   On February 16, 2022, investigators met with CW-3 at a predetermined location. Investigators searched CW-3's person and vehicle for contraband and currency with negative

results.   Investigators equipped CW-3 with an audio / video recording device.   Investigators surveilled CW-3 as he/she drove to the meeting location.

65.   CW-3 parked his/her vehicle on the street in the vicinity of 580 Blue Hill Avenue. CARMONA approached CW-3's vehicle and entered the front passenger side.   While in the vehicle, CARMONA removed a package and handed it to CW-3.   CARMONA stated that he was picking up additional pills from another supplier in an hour and offered to provide some of those pills to CW-3 if CW-3 agreed to come back.   CW-3 stated that he/she would check with "the boss," meaning UC-1.   CARMONA then exited CW-3's vehicle.

66.   Investigators surveilled CARMONA as he departed the area on foot.   CARMONA continued walking and investigators surveilled him back to the building where the Target Premises is located.   Investigators terminated surveillance when CARMONA entered the entrance to the building where the Target Premises is located.

67.   Investigators surveilled CW-3 as he drove back to the predetermined location.   At the predetermined location, CW-3 turned over the package of suspected fentanyl pills to investigators.   Investigators searched CW-3 for contraband and currency with negative results. Inside the package were eight blue pills resembling oxycodone pills.   Investigators did not conduct a field test, but based on my experience and training, the physical appearance of the pills, and the prevalence of counterfeit blue pills containing fentanyl currently circulating on the street, I believe the pills contain fentanyl.

*On March 3, 2022, After Leaving the Target Premises,*
*CARMONA Sold 2,000 Suspected Fentanyl Pills to CW-3.*

68.   In the days leading up to March 3, 2022, UC-1 and CARMONA exchanged phone calls and text messages to set up a meeting for CW-3 to pick up a larger quantity of fentanyl pills.

These calls and text messages were recorded and preserved.  UC-1 stated that his/her associate would pick up the pills, referring to CW-3.  UC-1 and CARMONA agreed that the deal would take place in the vicinity of 580 Blue Hill Avenue, Dorchester, Massachusetts.

69.  On March 3, 2022, investigators met with CW-3 at a predetermined location. Investigators searched CW-3's person and vehicle for contraband and currency with negative results.  Investigators equipped CW-3 with an audio / video recording and provided CW-3 with $6,000 to purchase the pills.  Investigators surveilled CW-3 as he/she drove to the meeting location.

70.  Prior to the meeting, investigators placed surveillance around the Target Premises. Investigators observed CARMONA exit the entrance to the building where the Target Premises is located wearing flip flops.  CARMONA walked down the street out of the view of investigators. A short time later, CARMONA walked back in the direction of the Target Premises and entered the entrance to the building where the Target Premises is located.  Later, closer in time to the planned meeting with CW-3, investigators observed CARMONA exit the entrance to the building where the Target Premises is located wearing sneakers and walk down the street.  CARMONA then boarded a bus and rode several stops.  CARMONA exited the bus and walked on foot to the meeting location.  Investigators could not surveil CARMONA as he rode on the bus, however, based on CARMONA's statements at the December 12, 2021 meeting regarding his use of public transportation to transport drugs, investigators believe that he transported drugs from the Target Premises to the meeting location.

71.  At the meeting location, CW-3 parked his vehicle on the street in the vicinity of 580 Blue Hill Avenue.  CARMONA approached CW-3's vehicle and entered the front passenger side.  While in the vehicle, CARMONA removed a clear plastic bag from his jacket and handed it to CW-3.  CW-3 then showed CARMONA the money in the center console of the vehicle.

24

CARMONA was disappointed that CW-3 had brought only $6,000, but CW-3 replied that he/she brought only the money he/she was given by UC-1.  CW-3 stated that UC-1 would likely be purchasing larger quantities of pills in the future.  CARMONA stated that he planned to contact UC-1 to conduct a larger deal the following week.  CARMONA then exited the vehicle.

72.  Investigators surveilled CARMONA as he departed the area on foot.  CARMONA continued walking and investigators surveilled him away from the deal location and then terminated surveillance.

73.  Investigators surveilled CW-3 as he drove back to the predetermined location.  At the predetermined location, CW-3 turned over the package of suspected fentanyl pills to investigators.  The pills were light blue in color and resembled oxycodone pills.  Investigators searched CW-3 for contraband and currency with negative results.  Investigators estimated that inside the plastic bag were approximately 2,000 pills.  The package weighed 250 grams. Investigators conducted a field test, which yielded a positive result for acetaminophen.  Based on my training and experience, fentanyl in pill form sometimes field tests positive for acetaminophen. Based on my experience and training, the physical appearance of the pills, the common use of acetaminophen as an outer coating for counterfeit pills, and the prevalence of counterfeit blue pills containing fentanyl currently circulating on the street, I believe the pills CW-3 received from CARMONA contain fentanyl.

*Additional Information Indicates that CARMONA Resides at the Target Premises.*

74.  On October 25, 2021, the Honorable M. Page Kelley authorized warrants to obtain the precise location information for the 0101 Phone and the 8175 Phone for a period of 30 days (21-mj-6609, 6611-MPK).  Pursuant to those warrants, investigators obtained precise location information for the two phones from October 28, 2021, to November 26, 2021.  This location data

showed that the 0101 Phone was located within .2 miles of the Target Premises overnight on the night of October 28 – 29, 2021.   The location data also showed the 0101 Phone was located within .2 miles of the Target Premises between 6:45 a.m. and 9:15 a.m., on October 31, 2021; between 4:45 a.m. and 5:45 a.m. on November 10, 2021; at 2:45 a.m. on November 16, 2021; at 12:15 p.m. on November 20, 2021; at 12:01 a.m., on November 22, 2021; at 10:46 p.m. on November 23, 2021; and at 12:01 a.m. on November 24, 2021.   Based on experience and training, I know that precise location information obtained from cellular phones often has a margin for error, and therefore, although the 0101 Phone was located within .2 miles of the Target Premises during the time periods described above, I believe the 0101 Phone was located at the Target Premises during those time periods.

75.   On the night of October 27 – 28, 2021, the 8175 Phone was located within .1 miles of the Target Premises.   After October 28, 2021, the 8175 Phone did not register any location information for the remainder of the warrant.   Based on experience and training, I believe that CARMONA stopped using the 8175 Phone after October 28, 2021 in order to evade law enforcement detection.   Based on experience and training and the times and dates of the location data from the phones known to be used by CARMONA, I believe that the Target Premises was CARMONA's residence.

76.   Comcast business records obtained through subpoena showed that the 0101 Phone, known to be used by CARMONA, accessed an IP address at the Target Premises from October 24 through 25, 2021, multiple times each day, and from January 27 through February 3, 2022 multiple times each day.   Based on my experience and training, I know that IP addresses are identifiers that show where a given device accesses the internet.   Investigators obtained the IP address used by

the 0101 Phone which showed the 0101 Phone accessed the internet from the Target Premises at the dates identified above.

77.   Based on the multiple trips to and from the building in which the Target Premises is located for drug deals, the photograph of CARMONA getting ready for the Encore Casino meeting at the Target Premises, the pickup location for the Encore Casino meeting one block from the Target Premises, the Facetime call with UC-1 from the Target Premises, the location data from phones known to be used by CARMONA indicating the phones were present in the vicinity of the Target Premises, the IP addresses linked to the Target Premises from which CARMONA accessed the internet, and the shoe change prior to the March 3, 2022 drug deal, investigators believe that the Target Premises is CARMONA's residence.

## Drug Traffickers' Use of Residences and Cell Phones Generally

78.   Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences:

a.      Controlled substances.

b.      Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c.      Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units.

d.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills.

e.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records.

f.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.      Labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j.      Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

79.      Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences, quantities of illicit drugs to maintain their ongoing drug business.  I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences

or stash locations.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences for longer periods of time than they keep drugs in their residences.

80.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

81.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

82.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

83.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

84.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels both used and unused in their residence for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

85.     During the course of searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences.  Evidence of occupancy, residency, rental and/or ownership of the

premises is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

86.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  As described above, the Target Subjects used cellular telephones to communicate with undercover agents and cooperating witnesses to arrange drug purchases.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences.  Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various

locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

87.     Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

88.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These

records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

89.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

90.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory

33

of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

    a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b.     Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.     Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d.     Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

**Conclusion**

91.    Based on the foregoing, there is probable cause to believe that the Target Subjects committed the Charged Offense and that evidence of the commission of the Charged Offense,

more specifically, the items set forth in Attachment B, will be found in the Target Premises, described in Attachment A.

Respectfully submitted,

/s/ Garrett S. Hassett

Garrett S. Hassett, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to telephonically in accordance with Federal Rule of Criminal Procedure

4.1 on March ___8___, 2022.

Hon. M. Page Kelley
Chief United States Magistrate Judge

35

**Attachment A – Premises to be Searched**

The premises to be searched is 88 Burt Street, Apartment #3, Dorchester, Massachusetts (the "Target Premises"). The building where the Target Premises is located is described as a beige colored vinyl sided, 3-story multi-unit residence with white trimmed windows and an outward facing deck with white wooden railings on each level with "88" affixed to the right front pillar of the exterior entrance to the building where the Target Premises is located.  The Target Premises is on the third floor of the building.



**Street view of the Target Premises**

**Attachment B—Items to be Seized**

All records, in whatever form, from January 2021 to present, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams of Fentanyl, 100 Grams or More of Fentanyl Analogue, and 500 Grams or More of Methamphetamine, in violation of Title 21, United States Code, Section 846 (hereinafter, the "Charged Offense").

1.  Illegal controlled substances, including but not limited to, methamphetamine and fentanyl.

2.  Paraphernalia for packaging and distributing controlled substances, including but not limited to, plastic bags and scales.

3.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

4.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, photographs, telephone address books; planners; notes; and ledgers.

5.  Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

6.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

7. Items of personal property that tend to identify the person(s) in control, or ownership of the target vehicle.  Such identification evidence is typical of the articles people commonly maintain in their vehicles, such as mail, registration documents, vehicle maintenance receipts, bank receipts, credit card receipts, identification documents, and keys.

8. Cellular telephones in the possession of or used by Jeffry CARMONA, a/k/a "El Gordo," FNU LNU, a/k/a "NATACHA,"  Miguel POLANCO, and ███████████ ███████ and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

    a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

    b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

    c. Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

    d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    e. GPS data;

    f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.  Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.